UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FORIDA

CASE No. 22-20290-CR-BLOOM/OTAZO-REYES

UNITES STATES OF AMERICA,

v.

ERIC DEAN SHEPPARD,

    Defendant.

_____/

## DEFENDANT ERIC SHEPPARD'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT, OR, IN THE ALTERNATIVE, FOR NEW TRIAL UNDER RULE 33

    Defendant Eric Sheppard, by and through undersigned counsel, hereby moves to dismiss the charges for which he was found guilty, or in the alternative, for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Mr. Sheppard respectfully submits that dismissal is appropriate given prosecutorial misconduct, and in the alternative, a new trial is warranted because of the errors that occurred both before and during the trial proceedings.[1]

    The government committed prosecutorial misconduct throughout the trial and during closing argument. This included, among other things: (1) misrepresenting critical facts about 404(b) evidence to mislead the Court and poison the jury against Defendant; (2) misusing that same 404(b) evidence during closing statements to improperly argue propensity; (3) misciting and misrepresenting case law to the Court; (4) telling the jury Defendant committed uncharged tax violations during closing argument; and (5) misstating the law on aggravated identity theft during closing argument.

    Further, the Court erred by: (1) admitting 404(b) evidence from Mr. Graff related to certain Visa application documents, based on the government's misrepresentations about that evidence in its pleadings, and then limiting the defense's cross-examination of Mr. Graff; (2) dismissing a

---

[1] This Motion should not be construed as an abandonment or waiver of any other motions or objections made prior to or during trial that are not addressed herein. *See Rand v. Nat'l Fin. Ins. Co.*, 304 F.3d 1049, 1052 (11th Cir. 2002) (it is a "settled rule in federal courts ... that a party may assert on appeal any question that has been properly raised in the trial court. Parties are not required to make a motion for a new trial challenging the supposed errors as a prerequisite to appeal.")

juror without cause near the end of trial, over Defendant's repeated objections; (3) admitting evidence regarding uncharged loans, resulting in a variance from the Superseding Indictment at [D.E. 60]; (4) admitting evidence of Defendant's alleged and uncharged tax violations, as well as other inadmissible evidence of "bad character"; (5) denying re-cross examination of key witnesses after the government raised new issues, for the first time, during re-direct examination; and (6) limiting the defense's cross-examination of key witnesses on material issues.

The cumulative impact of errors at trial, compounded by the government's prosecutorial misconduct and the broken-up trial schedule, resulted in an unfair trial. Relief is warranted.

## LEGAL STANDARD

Rule 33 permits a trial judge to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Eleventh Circuit has defined the "interest of justice" standard as "a broad standard" and not limited to cases where the district court concludes that its prior ruling was legally erroneous. *United States v. Vicaria M.D.*, 12 F.3d 195, 198 (11th Cir. 1994). If a district court reviews a ruling it made and believes that it would exercise its discretion differently, the court may order a new trial if doing so serves the interest of justice. Appellate courts relying on *Vicaria* have rejected the notion that district courts may not order new trials absent an identifiable legal error. *United States v. Hatcher*, 2011 WL 4425314, *7 (11th Cir. 2011); *United States. v. Scroggins*, 485 F.3d 824, 831 (5th Cir. 2007) ("A miscarriage of justice warranting a new trial in certain circumstances may occur even where there has been no specific legal error.").

Further, even if a single error, standing alone, is found to be harmless, the cumulative effect of more than one error may be sufficient to deprive a defendant of a fair trial. *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984); *see also United States v. Vasquez*, 225 Fed. Appx. 831, 836 (11th Cir. 2007) ("The cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary") (internal quotations omitted). Here, the verdict was based on several errors that, alone and together, deprived Mr. Sheppard of a fair trial. Justice requires vacating Mr. Sheppard's conviction and a new trial.

## ARGUMENT

### I. The Court Erred In Its Rulings Regarding 404(b) Evidence

Before trial, at the beginning of trial, and during trial, the defense argued to the Court that alleged 404(b) evidence from Jeffrey Graff was inadmissible. The defense told the Court that the

2

government had misrepresented facts in its 404(b) notice, which the defense knew for certain because the defense had also interviewed Mr. Graff pre-trial. In conversations with the defense, Mr. Graff stated material facts contrary to the government's representations in its 404(b) filings. The defense requested that prior to the admission of the alleged 404(b) evidence at trial, that it be permitted to argue its inadmissibility to the Court. The Court overruled the defense request. In addition, the Court limited the defense's cross-examination of Mr. Graff on critical and highly prejudicial portions of his testimony, such that one of his critical claims could not be countered.

The following brief recounting of disclosures to the Court regarding the alleged 404(b) evidence shows the government's shifting narrative.

### A. The Government's 404(b) Notice and Defendant's Response

The government's original 404(b) notice stated:

> J.G. learned that in 2018, the defendant had forged J.G.'s signature and had misrepresented J.G. as the applicant/sponsor for a non-immigrant visa application . . .
>
> The **misrepresentations and the forged signature** of J.G. were made on a **company letter** addressed to the United States Embassy in Mexico, purportedly submitted by J.G., as the Chief Financial Officer (which he no longer was), and on a **form prepared for filing with the U.S. Department of Homeland Security** in which the defendant's immigration counsel (not counsel in this case) entered a notice of appearance on behalf of the applicant/ sponsor, J.G.
>
> The events that J.G. would describe involve making material <u>misrepresentations to federal agencies – the U.S. Department of State and the Department of Homeland Security</u>. . .

[D.E. 77] (emphasis added). As shown above, the government originally told the Court that Defendant forged Mr. Graff's signature on the Visa application documents—i.e., the company letter to the Embassy and the form required by Homeland Security. The government did not mention any engagement letter in the 404(b) notice.

Upon receipt of the 404(b) notice, the defense objected. [D.E. 77]. The defense explained that the government was misrepresenting the evidence, and beyond that, the evidence was unnecessary, irrelevant, and prejudicial. [D.E. 77 at 3, 4, and 8]. The defense told the Court plainly, "it is defense counsel's representation to the Court that the 404(b) notice does not reflect the witness's anticipated testimony." [*Id* at 10]. The defense knew this because undersigned counsel

was also speaking with Mr. Graff, and he disputed the government's characterizations of the 404(b) evidence in those conversations. Because the defense and the government were getting different versions of the facts from Mr. Graff, the defense requested an evidentiary hearing to establish Mr. Graff's actual testimony.

### B. The Government's Reply Concerning 404(b)

In its reply, the government changed its story *completely* regarding the 404(b) evidence. [D.E. 116]. The government alleged in reply that Mr. Graff would say:

- His signature was forged on an engagement letter (never mentioned in the original notice) and that signature "*reflects*" Defendant's handwriting.

- The forged signatures on the Visa application documents, while not Defendant's handwriting, would only have been done at Defendant's direction. [*Id.* at 3, 8].

- "[Mr. Graff] will testify to having personal knowledge of all the facts described above." [*Id.* at 6].

### C. The Court's Order Permitting 404(b) Evidence

In denying Defendant's motion to exclude the alleged 404(b) evidence, the Court stated the evidence would be relevant "[i]f [Graff] can establish . . . how he knows whether someone would have forged his name at Defendant's direction." [D.E. 123 at 8]. The Court also found there was sufficient proof that Defendant did what the government claimed, based on the <u>government's representations</u> about the anticipated testimony. [*Id.* at 11]. Finally, the Court denied the defense's request for a pre-trial evidentiary hearing. [*Id.* at 16].

### D. Mr. Graff's Actual Testimony At Trial

On direct, Mr. Graff baselessly speculated that he believed Defendant forged his signature on an *engagement letter* for a law firm to work on the Visa application. [12/06/23 AM Tr. 121:19-122:7]. The government also asked Mr. Graff numerous questions suggesting to the jury that Mr. Graff's name would not have been forged on the Visa application documents without being directed to do so by Defendant. [12/6/23 PM (Graff) 71:5-72:10].[2] This was a far cry from the

---

[2] The government asked Mr. Graff several improper questions, back-to-back, about whether the Visa application signatures would only have been done at Defendant's direction. The defense's objections were sustained on these questions. Later, on December 11, the government falsely told the Court, "With respect to the [Visa application documents], I brought out on direct that he did not recognize the handwriting on those signatures, but that -- but that, based on his experience, people who work for Eric Sheppard would not have signed that document without his express

4

original 404(b) notice, and Mr. Graff never established any basis for this testimony, as was required in the Court's Order.

On cross examination, Graff admitted that he never saw Defendant sign *his* (Mr. Graff's) name and thus was <u>not</u> familiar with what Defendant's version of his signature would look like, nor did he have any evidence that the Defendant directed anyone else to sign it. [12/06/23 AM Tr. at 121:19-122:7]. Beyond that, Mr. Graff admitted this testimony about the engagement letter was speculation during cross-examination:

> DEFENSE: Let's talk about what you have said about the engagement letter signing. Do you agree that you have gone back and forth about whether or not it's your testimony that Eric signed the engagement letter?
>
> GRAFF: Yes.
>
> DEFENSE: And the reason that you have gone back and forth is because honestly, you've never seen Eric sign your name, right?
>
> GRAFF: Correct.
>
> . . .
>
> DEFENSE: And you couldn't for sure swear that he did [sign] like you did with others?
>
> GRAFF: Correct.
>
> [Defense reserves motion with Court based on this testimony].

[12/11/23 (Graff Cross) 121:17-122:10].

Having established that Mr. Graff's testimony regarding the engagement letter was pure speculation, the defense then showed the same was true regarding the government's suggestion that Mr. Graff's name would only have been forged on the Visa application documents with Defendant's knowledge or at his direction, confirming that the government had misled the Court in its 404(b) filings regarding the Visa application documents. Mr. Graff admitted: (1) he *never* told the government Defendant forged his name on any of the Visa application documents; and (2) he *never* had any evidence, and *never* told the government, that Defendant told anyone to forge his name on the Visa application documents. [12/06/23 AM Tr. at 117:9-118:6].

---

direction and authorization. That's what the testimony was." Mr. Graff never gave this testimony on direct, as claimed by the government.

5

Despite these admissions, Mr. Graff claimed on cross that Defendant's employees "normally don't go rogue." [12/11/23 Tr. (Graff) at 141: 8-11). On this claim, the defense tried to ask Mr. Graff several questions about a former project manager of the companies, Scott Fish, with whom Mr. Graff also worked, and who stole over a million dollars from the companies under the Defendant's nose, contrary to Mr. Graff's testimony about rogue employees. [12/11/23 Tr. 141:17-142:142:20]. The Court sustained the government's objections to every single question on this topic, denying Defendant the opportunity to fully cross-examine Mr. Graff, a key government witness, in his assertion that nothing happened at the companies without Defendant's knowledge or direction. Not only was it error to allow the alleged 404(b) evidence to begin with, but the prejudice was particularly acute because the Court limited cross examination of the witness.

In sum, this was not proper 404(b) evidence. It did not conform to the government's 404(b) filings or the Court's order allowing the government to introduce the evidence at trial. The evidence was highly prejudicial and did not meet the standard under 404(b). Nor was this evidence "inextricably intertwined" with the case, as the government claimed in its reply brief. [D.E. 116 at 4]. This evidence was from years before the loans at issue were applied for. Indeed, Mr. Graff was not even at the company when the government loans at issue were applied for. The evidence was wholly unnecessary to complete any story regarding the charges and should not have been admitted.

As discussed below, the government made matters even worse when it suggested in rebuttal closing that the alleged Visa application forgeries showed Defendant had forged once before, and that meant he forged again in connection with the loan applications. [1/11/23 Tr. 148:12-19] ("He was trying to make it happen. And you know that it was not a mistake. And it was him. *Because you know from the evidence in this case that that is something – as I just showed you he just did it[,]*. . .") (emphasis added). Mr. Graff's testimony was used as improper propensity evidence under Rule 404(b)(1). *See infra* n.7. Not only that, but this statement was contrary to all evidence.

## II. The Court Erred By Admitting Evidence Of Other Uncharged Loans, Creating a Variance from the Indictment

Per the Superseding Indictment:
- The scheme to defraud ran from April 2020 through March 2021. [D.E. 60 at ¶2].
- Defendant submitted fraudulent PPP and EIDL loan applications on behalf of HM UP Development Alafaya Trails, LLC ("HM UP"); HM Management and

- Development, LLC ("HM Management"); and HM Four LLC ("HM Four"). [*Id.* at 4].
- Defendant was charged with nine counts of wire fraud and five counts of aggravated identity theft. [*Id.* at pp. 7-8].
- The companies named in these fourteen counts are the same as those listed in paragraph 4—HM UP, HM Management, and HM Four (collectively, the "Indictment Companies"). *Id.*
- The 4 loans listed in the charges are the HM Four EIDL loan in fall 2020, the HM UP attempted second draw PPP loan with PayPal in early 2021, the HM UP second draw PPP loan with Northeast Bank in early 2021, and the HM Management PPP loan with Cross-River Bank in early 2021 (collectively, the "Charged Loans").

During trial, the government sought to introduce evidence of numerous additional loans and attempted loans which were not charged in the Superseding Indictment (the "Uncharged Loans"). The Uncharged Loans included loans attempted by companies other than the Indictment Companies, as well as attempted modifications or extensions of loans occurring long after March 2021.

The defense objected and argued, among other things: (a) the government never gave a 404(b) notice concerning these Uncharged Loans; (b) there was a Bill of Particulars in which the government never mentioned these Uncharged Loans; and (c) there was a Superseding Indictment in which the government removed several of the Uncharged Loans from the original Indictment, adding to Defendant's surprise at trial. [12:12:23 PM T. 149:20-151:8; 12/13/23 PM T. 1:9-7:11; 125:15-129:6]. In other words, the defense reasonably believed that the "scheme to defraud" would be the four Charged Loans referred to in the counts of the Superseding Indictment.

The government's response to Defendant's motion for bill of particulars is particularly illuminating. In that response, the government represented to the Court that the Indictment contained "all required information to put [Defendant] on notice of the wire fraud charges". [D.E. 38 at 2]. Further, the government said it had informed Defendant about the specific loans he was charged with, identified the dates on which the applications were made, and identified the lending institutions and the companies on whose behalf the applications were submitted. [*Id.* at 8]. Despite these representations, the government, over objection, varied from the Superseding Indictment by

7

introducing significant evidence of the Uncharged Loans and drastically expanding the case, to the detriment and prejudice of Defendant.

During trial, and immediately prior to admission of evidence of the Uncharged Loans, the government directed the Court to *United States v Davis*, 172 Fed Appx 175 (9th Cir. 2006), which it represented on the record was a binding Eleventh Circuit opinion. Defendant had not been provided the *Davis* case and was left to search for it on Westlaw, while the government argued it. *Davis* is completely distinguishable from the instant case. With respect to the Uncharged Loans, the defense position was that they were not included in a 404(b) notice. In *Davis*, there *was* a 404(b) notice and the question was whether it was sufficient. This was a pivotal argument, but the defense was barely given enough to read *Davis* to make an argument. At the government's persistent urging, the Court advised it was bound by *Davis*, "a Fifth Circuit case," even though defense counsel, not the government, corrected the government as to it being a Ninth Circuit case. [12/13/23 PM Tr. 3:7-11; 5:12-17; 6:19-7:3]. Given this finding, the Court ruled that evidence regarding Uncharged Loans that were applied for during the relevant timeframe would be admissible, as well as evidence regarding a subset of the Uncharged Loans that fell outside the timeframe and were attempted "modifications" of Uncharged Loans within the timeframe.

This all resulted in the government presenting a case to the jury of loans and attempted loans totaling $1.8 million in alleged fraud, as opposed to the $460,000 in four Charged Loans named in the Superseding Indictment. This was highly prejudicial and misleading to the jury. These Uncharged Loans became a feature of the case—so much so that after one hour of deliberations the jury sent out a note asking for the chart the government used in closing that listed many of these Uncharged Loans. This issue alone warrants a new trial.

### III. Dismissal Of Juror No. 3 Over Defense Objections

More than halfway through trial, the Court dismissed Juror No. 3, who the defense considered to be a very favorable juror.[3] The Defendant personally requested, through defense counsel, that Juror No. 3 remain on the jury and not be dismissed. The defense strenuously and repeatedly objected to dismissal of Juror No. 3.

---

[3] Juror No. 3 was the owner and CEO of a large construction company for over 27 years. He was obviously familiar with many of the issues that arose during the trial and likely could see the issues from Defendant's perspective better than any other juror.

Several days before his ultimate dismissal, and after trial had already begun, Juror No. 3 was called into Court given the government's alleged concerns that he may not be able to focus on the trial given his wife's illness. Juror No. 3 assured the parties and the Court, on the record, that this was not the case. He said was able to focus, and if that should change for any reason, <u>he would inform the Court immediately</u>. The Court advised it was not willing to excuse this juror who had only asked to be accommodated. [12/11/23 Tr. 4:13-14].

The very next day, it came to the Court's attention that Juror No. 3 needed two mornings off to attend appointments with his wife, who needed surgery. Notably, Juror No. 3 still never requested dismissal or told the Court that he was unable to focus on the trial. Nonetheless, because Juror No. 3's schedule would require the Court to take partial days off from trial, the Court dismissed Juror No. 3 over the defense objections (and contrary to the Court's pronouncement the previous day) for the stated reason that accommodating his schedule would impact the trial schedule. [12/12/23 AM Tr. 6:25-5]. Not only was dismissal of Juror No. 3 highly prejudicial to the defense and without good cause but removing him did not solve any of the Court's scheduling problems. Trial in this matter continued until January 12, 2024—an entire month after Juror No. 3's dismissal, including a 3-week adjournment over the holidays.

## IV. The Court Erred By Allowing Evidence Of Uncharged Tax Violations And Other Evidence of "Bad Character"

The government also made repeated references to Defendant violating various tax laws which were not charged. In particular, the government's IRS expert spent substantial time testifying about alleged tax violations, which went far outside the scope of his expert disclosure. [D.E. 74]. The defense filed a motion in limine on the issue, in part based on the expert disclosure, which was denied. [D.E. 84].

As soon as the IRS expert exceeded the scope of his notice, the defense objected. That objection was overruled, and the expert was given free rein to testify to all matters put to him by the government, including numerous claimed or suggested additional alleged tax violations or crimes, beyond the scope of the Superseding Indictment, beyond the scope of the expert disclosure, and for which the defense was unprepared to respond, as well as gratuitous attacks on Defendant's income and wealth. [11/28/23 PM (Palmer) 20:5-21-22:6; *see, e.g.,* 24:3-25; 29:19-32:23; 36:5-39:2; 39:13-42:22; 43:18-44:6; 47:21-48:3; 50:3-4]. The testimony includes topics such as Mr. Sheppard's personal tax returns, also admitted over Defendant's objection, and without a limiting

9

instruction, and the irrelevant but prejudicial fact that no personal return was filed in recent years, the final point made by the prosecutor on the final question on direct, to underscore the prosecutor's focus on prejudicial, irrelevant, alleged tax non-compliance. [*Id.* at 39:13-42:22, 55:19-15]. The expert was also permitted to testify extensively to these alleged bad acts for 2018 and 2019, which is outside the time frame of the Superseding Indictment and well outside the substance of the charges. [*See, e.g. id.* at 29:19-32:23; 36:5].

The government portrayed Defendant as someone who did not pay his taxes or file his tax returns on time, none of which was charged (and none of which was true). As one example, among many, the government elicited testimony from multiple witnesses that suggested to the jury there were no W-2 employees in 2019. During its case in chief, the defense proved this was false, or at least was represented to be false to Sheppard by his accounting department. The defense admitted Trial Exhibit Y-1, which showed HMMD W-2s for 2019, as well as printed confirmations and online chat correspondence with an unknown individual confirming that the 2019 W-2s were e-filed on January 31, 2020. In addition to prejudicing Defendant because these were uncharged tax violations, it also prejudiced Defendant and served to distract the jury to have so much collateral litigation over uncharged crimes. Admitting this evidence over repeated defense objections pre-trial and during trial, and permitting closing arguments focused on these uncharged acts, was error.

The government also repeatedly elicited witness testimony that Defendant did not pay his bills, suggesting to the jury that if Defendant received PPP monies, he should have at least paid his workers with it.[4] For example, at the end of its redirect, the government asked Mr. Graff if he was owed money when he left Defendant's company, and whether Defendant contacted him after the PPP and EIDL loans were funded to pay him back. [12/6/23 T. (Graff) at 95:1-96:5]. The government continued with this improper tactic through its rebuttal case, when it elicited testimony, over objection, about unpaid bills to an accounting firm. [1/10/24 PM Tr. P. 132:15-20]. This too became a featured theme of the government throughout the proceedings, and, over objections, was permitted by the Court.[5]

---

[4] In truth, the ***unrebutted*** expert testimony from the defense's expert witness, Scott Bouchner, was that Defendant paid over $900,000 in payroll during the relevant period, which exceeded the total amount of all government loan proceeds, charged and uncharged. [1/10/24 PM Tr. at 56:22-58:8].

[5] The defense anticipated this improper line of attack and moved in limine to exclude it, but the motion was denied.

### V. The Court Erred By Denying The Defense Re-Cross Examination Where Appropriate

The Court erred in not permitting the Defendant to have re-cross after the government intentionally waited until re-direct to introduce evidence on a particular topic. Specifically, with regards to testimony of PayPal representative Jammie Hutchinson, on cross-examination it was established that PayPal did not request, review, or rely on the tax returns of the applicant. Thereafter, on re-direct, for the first time, the government questioned Ms. Hutchinson about a new theory on why 1065 tax returns of the applicant might be required. When the defense asked for limited re-cross to address this new theory, the Court denied the request without discussion or hearing argument. [11/30/24 PM Tr. 132:24-2]. This occurred again later during trial, with Spencer Lord, a representative for Cross River Bank, on the same issue. [12/5/23 PM Tr. 126:20-25, 127:16-17].

### VI. The Court Erred By Improperly Limiting The Defense's Cross-Examination

The Court prohibited cross examination of key government witnesses by sustaining government objections which were not made in good faith and were apparently seeded in the fact that the government never did a proper investigation into the backgrounds of their own witnesses and were surprised at the information. For example, the Court limited cross examination of Joe Beirne, a critical witness on all Counts, by preventing questioning by the defense regarding Mr. Beirne's businesses and what he previously told the FBI in an interview memorialized in a 302 report.

The government called Mr. Beirne to testify that he was an independent contractor and not a W-2 employee. The defense attempted to impeach Mr. Beirne but was repeatedly shut down by the Court. The government, through Mr. Beirne, painted Defendant as a deadbeat who owed Mr. Beirne money, which was a lie. When the defense attempted to impugn Mr. Beirne's credibility with his own bankruptcy case and filings, as well as judgments against him for fraud, the Court sustained the government's objections and deemed the questioning irrelevant. [11/29/23 PM 23:6-23; 34:19-39:24]. At sidebar, the Court erred by ruling that unless Defendant had evidence of a criminal conviction of Mr. Beirne, the information was not to be used as impeachment. This impeachment was critical to show that Mr. Beirne, like Mr. Salem, lied to the FBI during his interview about his business in Ohio and the circumstances of his working for Defendant in Orlando. The truth was Mr. Beirne was out of business and had a pending bankruptcy and 22

lawsuits against him, most of which were for fraud and failure to pay workers. This information would have directly impeached his testimony and showed he deliberately lied to the FBI when interviewed. Moreover, it would have shown his bias. The Court prohibited all of it. [11/29/23 PM Tr. p. 39:8-20]. The witness's credibility was also important because he testified, falsely, that he helped Defendant submit a hard copy PPP loan application, by hand, to an unnamed bank. Defendant was prohibited from a full and fair cross examination of this key witness.

A second example, also discussed above, occurred during the cross-examination of Mr. Graff. On direct, the government asked Mr. Graff numerous questions suggesting to the jury that Mr. Graff's name would not have been forged on the Visa application documents without being directed to do so by Defendant. [12/6/23 PM (Graff) 71:5-72:10]. On cross, Mr. Graff stated Defendant's companies would not normally "go rogue." [12/11/23 Tr. (Graff) at 141: 8-11]. The defense attempted to ask Mr. Graff about one of Defendant's former project managers, Scott Fish, who stole millions of dollars from Defendant's companies, without Defendant's knowledge, during Mr. Graff's tenure. [12/11/23 Tr. p. 141:17-142:20]. This was critical and material cross-examination to counter Mr. Graff's suggestion that neither Jeff Vasilas or Jeanette Gonzalez could have or would have done anything improper without Defendant knowing it or directing it.[6] The Court sustained repeated objections to this testimony and denied defense counsel's requested sidebar to explain the relevance. [*Id.*]

Given these limitations, the defense was also prohibited from developing one of its theories of defense—that the FBI did not meaningfully start investigating this case until right before trial, and agents never even did a background check on these witnesses. In its rush to judgment, the FBI neglected to take any action on these fraudsters—much like with Mr. Graff who admitted to committing tax fraud on the stand to the tune of over one million dollars, which was more money than Defendant was charged with in this case.

**VII.  The Court Erred By Denying Defense Motion For Mistrial After Closing**

As detailed below in Section VIII, the government committed prosecutorial misconduct in closing argument. The Court erred by overruling the defense's objections to the government's

---

[6] In closing, the government said it was "ludicrous" to think that Jeff Vasilas or Jeanette Gonzalez would do any such thing, despite uncontroverted evidence otherwise, including Mr. Vasilas forging Defendant's name, and other evidence such as testimony from Mari Ataca that Mr. Vasilas had access to the home office and computer, even when Defendant was absent.

closing argument and not granting a mistrial based upon the government's misconduct. [1/11/23 AM Tr. p, 156:23-157:24].

## VIII. Prosecutorial Misconduct During Trial And Closing Argument

As discussed above, there are numerous examples of the government's prosecutorial misconduct *during* trial.

The government's conduct only got worse during closing argument, when it repeatedly made arguments to the jury that were not supported by any competent evidence. There are several egregious examples.

First, during rebuttal closing, the government ended its presentation by falsely suggesting that Defendant forged Visa application documents and, if he had forged before, he would do it again. [1/11/23 AM Tr. 148:12-19]. The defense immediately objected and reserved a motion. Mr. Graff never testified that Defendant forged Visa application documents. In fact, Mr. Graff admitted that the handwriting on the Visa application documents was not Defendant's handwriting. Even worse, the government represented to the Court that it would not use the alleged 404(b) evidence to show propensity.[7] But that is exactly what it did, and the government made sure it was its final word to the jury. This too was highly prejudicial, and given it was rebuttal closing, Defendant had no ability to even respond.

Second, the government argued Defendant forged Jeanette Gonzalez's name on documents by comparing her purported signature on documents in question. [1/11/23 AM Tr. 76:13-20]. There was zero competent evidence regarding Jeanette Gonzalez's "real" signature. Jeanette Gonzalez, despite receiving immunity from the government, was never called as a witness. The government never established her true signature with any witness. It was inappropriate, and without any basis, to show the jury in closing a document purporting to contain her real signature and then compare it to some other signature. It was even worse for the government to attribute any of these signatures to Defendant as "forgeries."

Third, the government argued that Defendant committed uncharged tax violations, as discussed further above. [1/11/23 AM Tr. 135:11-14].

---

[7] *See* [D.E. 77 at 2] ("The government intends to introduce the evidence outlined in this Notice for the uses *authorized by Fed. R. Evid. 404(b)* . . .") (emphasis added). *See also* [D.E. 116 at 6] (calling Defendant's argument that Mr. Graff's testimony would be used to cause the jury to draw an improper propensity inference "not persuasive").

13

Fourth, the government told the jury that the tax returns signed by Mr. Cupersmith lent "credibility and reliability" to the applications, and "the means of identification . . . is to lend credibility to his applications." [1/11/23 AM Tr. 78:4-15]. This was wrong, misleading, and prejudicial. There is absolutely no evidence that the use of Mr. Cupersmith's identity on the returns had any impact at all on the underwriting process at Northeast or Cross-River (Counts 13 and 14), such as by lending credibility or reliability to the applications. Because the government lacked any evidence of same, it resorted to misleading the jury with false and unsupported statements in closing, telling the jury what to believe.

Fifth, the government varied from the Superseding Indictment dramatically, making the case largely about $1.8 million including Uncharged Loans, as opposed to the $460,000 in four Charged Loans named in the Superseding Indictment. These Uncharged Loans became a feature of the case, and this continued during closing. The government presented for closing a blown-up chart containing numerus Uncharged Loans, effectively instructing the jury that the scheme went far beyond the timeframe in the Superseding Indictment. The chart was left in front of the jury for the entirety of the government closing. This was improper. Tellingly, this was the only document the jury requested to see while deliberating.

Sixth, contrary to the all the evidence, the government argued to the jury that the Defendant improperly commingled the loan funds and used the money for his personal benefit, paying his home mortgage and for jewelry. Every single government witness who was asked, testified that commingling of government loan proceeds with other monies was expected and acceptable, and that money was fungible, and that tracing was not required to show how the loan proceeds were spent. Moreover, defense expert Scott Bouchner testified that during all relevant periods, there was sufficient non-government loan funds in the accounts to cover all personal expenses. The government could have rebutted the testimony of Mr. Bouchner, who carefully analyzed all the monies in and out of the accounts, dispelling the government's claims regarding payment of personal expenses. But the government chose not to do so, and instead argued in closing as if Mr. Bouchner's testimony, and the testimony of its own witnesses, did not exist.

Seventh, the government misrepresented Mr. Graff's testimony concerning the Form 941s at issue. The jury found Defendant guilty of submitting fraudulent 941s, and that decision was undoubtedly aided by the government's improper closing argument about Defendant's and Ms. Gonzalez's signatures, discussed above. But it was also heavily impacted by the government's

14

false assertion that Mr. Graff identified Mr. Sheppard's handwriting on "each and every one of these false 941s". [1/11/23 AM Tr. 71:21-72:7; 76:9-20]. In fact, Mr. Graff failed to identify Mr. Sheppard's handwriting on most of the 941s given many were typed, and of the two that were handwritten, one was clearly not done by Defendant:

> AUSA: This one, on this page, is the handwriting the same or a little bit different? . . .
>
> AUSA: Does it look to you like the Defendant's handwriting?
>
> GRAFF: Not overly.
>
> AUSA: I'm sorry not what?
>
> GRAFF: It does not overly look like the Defendant's handwriting.
>
> AUSA: Are you sure or unsure?
>
> [defense objection sustained]

[12/06/23 PM Tr. p. 58:18-59:8]. This is a far cry from identifying Mr. Sheppard's handwriting on "each and every one" as the government misrepresented. Indeed, several 941s were not even shown to Mr. Graff.

The government's prosecutorial misconduct in closing was highly prejudicial given the length of trial, the number of Uncharged Loans inserted into the case improperly, the multiplicitous and duplicitous Superseding Indictment, and the 3-week break occurred in trial over the holidays, which no doubt hampered the jury's ability to recall all the evidence. The members of the jury were looking to the lawyers in closing to remind them of the evidence. The jury naturally relied on the good-faith of the prosecutors to stick to the evidence and not argue evidence that did not exist. And with only 1.5 hours to tell the defense story, which was not enough *before* the government's conduct in its closing, the defense could not refute all the government's misrepresentations in its own closing argument.

Based on the government's prosecutorial misconduct during trial and closing argument, as discussed above, Defendant requests dismissal of the charges for which he was found guilty. Defendant suffered actual prejudice from the government's misconduct. *See United States v. Barr*, 2019 WL 3066327 (N.D. Ga. April 23, 2019) (dismissal of indictment for prosecutorial misconduct depends upon a showing of actual prejudice). The government knew going into closing arguments that the jury may very well acquit, and it made the cynical decision to cross the line—blatantly and repeatedly—on the calculus that that a conviction that might be reversed is better than an acquittal. The government should not get a pass on this.

## CUMULATIVE IMPACT OF ERRORS AND PROSECUTORIAL MISCONDUCT

If the Court does not find dismissal is warranted given the government's prosecutorial misconduct, it is Defendant's position that a new trial is warranted.

Many of the above errors are serious and standing on their own deprived Defendant of a fair trial. But even if the Court were to find that all its rulings, individually, were justified or constituted harmless errors, it is the cumulative effect of the errors compounded with the government's prosecutorial misconduct in closing and throughout the proceeding that deprived Defendant of a trial. *See Pearson*, 746 F.2d at 796 (finding that even if a single error, standing alone, is found to be harmless, the cumulative effect of more than one error may be sufficient to deprive a defendant of a fair trial); *Vasquez*, 225 Fed. Appx. at 836 ("The cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary") (internal quotations omitted).

The trial schedule also contributed to the cumulative impact of the errors and the harm caused by the government's prosecutorial misconduct. Before trial began, the government estimated that its case would take 5-7 trial days. At calendar call, the government modified its estimate to 8-10 trial days. At that time, everyone knew the defense would have its own substantial case to present, as it had already disclosed a forensic accounting expert witness before calendar call, among several other witnesses on the defense witness list. [*See, e.g.*, D.E. 63].

At the end of the day, the trial took almost twice as many trial days as anticipated and lasted well over 6 weeks. This included a 3-week adjournment over the holidays. The jury was so desperate for this case to end that the same after they received the case for deliberations, late in the day on Thursday, January 11, they informed the Court they could not come to agreement on 12 of 14 counts and were deadlocked. The jury rendered its verdict the next day—early Friday afternoon of a long holiday weekend. The verdict, which was obviously a compromise, is also inconsistent.

For example, no reasonable juror could find Defendant *guilty* of Count 5 of the Superseding Indictment, after having found him *not guilty* of Counts 4 and 6. Count 5 related to the electronic submission of IRS Form 941s to PayPal on February 11, 2021. [D.E. 60 at 7]. The jury found Mr. Sheppard guilty of submitting these 941s, which were allegedly fraudulent because they suggested Mr. Sheppard's companies had W-2 employees during the relevant period. Count 4 related to submission of a fraudulent PPP application to PayPal a few weeks earlier, on January 19, 2021.

16

*Id.* This application was allegedly fraudulent because, among other things, it claimed average monthly payroll for W-2 employees during the relevant period, but the jury found Mr. Sheppard not guilty of submitting a fraudulent application to PayPal. Similarly, Count 6 related to electronic submission of a fraudulent Form 1065 to PayPal on February 26, 2021, after the submission of the 941s. *Id.* The tax return was allegedly fraudulent because it represented that Mr. Sheppard's companies had W-2 employees during the relevant period. The jury found Mr. Sheppard not guilty of submitting the fraudulent 1065. Thus, inexplicably, the jury found Mr. Sheppard did ***not*** submit a fraudulent application with fake W-2 payroll to PayPal in January 2021; found he ***did*** submit fraudulent 941s to PayPal with fake W-2 payroll on February 11, 2021; and found he did ***not*** submit a fraudulent tax return to PayPal with fake W-2 payroll on February 26, 2021. These verdicts are inconsistent and impossible to reconcile.

Similarly, no reasonable juror could find Defendant *guilty* of Count 13 of the Superseding Indictment, after having found him *not guilty* of Count 12. Both Counts 12 and 13 charged Defendant with aggravated identity theft for using Neil Cupersmith's name and tax information on tax returns submitted to PayPal on February 26, 2021, and to Northeast Bank on March 11, 2021. [D.E. 60 at 8]. The tax returns at issue in these two counts are identical photocopies of each other. The only difference is a handwritten change at the top of the tax return for Count 13, which has no bearing on the identity theft aspect of the charge.

The jury's inconsistent verdict was the natural consequence of an unfair trial, caused by the cumulative effect of errors, prosecutorial misconduct, and the trial schedule. Inconsistent verdicts reflect an irrational decision prompted after delivery of a coercive Allen charge, to a jury that had expected to be done with the case before the holiday, not in mid-January.

## **CONCLUSION**

For the reasons set forth herein, Defendant Eric Sheppard respectfully requests that this Court either (1) dismiss the charges for which he was found guilty, or (2) grant him a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Dated: February 2, 2024.                    Respectfully submitted,

**NELSON MULLINS**
One Biscayne Tower, 21st Floor
2 S. Biscayne Boulevard
Miami, FL 33131
Telephone: 305.373.9400

By: /s/ Jayne C. Weintraub
Jayne C. Weintraub
Florida Bar No. 320382
Jonathan Etra
Florida Bar No. 686905
Christopher Cavallo
Florida Bar No. 0092305

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 2, 2024, the foregoing document was filed via the Court's CM/ECF system to all counsel of record.

By: /s/ Jayne C. Weintraub
Jayne C. Weintraub