UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-20290-CR-BLOOM(s)

UNITED STATES OF AMERICA

vs.

ERIC DEAN SHEPPARD

               **Defendant.**

_____/

### UNITED STATES' OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

The United States of America, through the undersigned Assistant United States Attorney, hereby submits its objections to the Presentence Investigation Report ("PSR") in connection with defendant, Eric Dean Sheppard's sentencing.

**Paragraph 37:**

The government seeks to make a correction to the time frame set forth in the Offense Conduct at Paragraph 37. This Paragraph refers to Sheppard's submission of false and fraudulent documents to support the Paycheck Protection Program ("PPP") second draw loan application to PayPal/WebBank on behalf of HM-UP Development Alafaya Trails, LLC ("Alafaya Trails"), and provides the time frame of April 2020 through March 2021. Sheppard's submission of false and fraudulent documents in support of the second draw PPP loan application to PayPal occurred between January 19, 2021 and March 2021.

**Paragraphs 103, 109:**

The defendant was not truthful in reporting to Probation that he does not earn any income from HM-UP Development Alafaya Trails, LLC because the company sold its assets in September

2022. Shortly after the defendant was arrested in this case, on September 22, 2022, he sold the Orlando shopping center, the Shoppes at Alafaya Trail, to himself; he sold the shopping center to a corporation that is the defendant's alter ego. The warranty deed reflecting the sale indicates that Alafaya Trails sold the shopping center to a company named, 1200 Alafaya, LLC. *See* Govt. Trial Exh. 3-3. That company, 1200 Alafaya, was formed just days earlier, on August 31, 2022, and has as its principal address the defendant's residence: 180 Bal Cross Drive, Bal Harbour, FL 33154. The company's listed manager is 1200 Alafaya Manager, LLC, also with a listed address of 180 Bal Cross Drive, Bal Harbour, FL 33154. The warranty deed transferring the Orlando shopping center to 1200 Alafaya is signed by Jennifer Sheppard, as the Manager of 1200 Alafaya Manager. *See id*.

The PSR should reflect the Shoppes at Alafaya as an asset of the defendant, and the defendant should be required to report to Probation the significant income he earns from this valuable asset.

**Paragraph 105:**

The government objects to the defendant's characterization that HM Four, LLC is "active for the purpose of overseeing a 150,000 square foot shopping center and its common area requirements …." HM Four is the 99% owner of HM-UP Development Alafaya Trails, LLC ("Alafaya Trails"), which in turn owned the Shoppes at Alafaya until the defendant transferred the shopping center to 1200 Alafaya, LLC in September 2022. The government is not aware of another shopping center (indirectly) owned by HM Four. Even when Alafaya Trails owned the Shoppes at Alafaya, HM Four's income tax returns (for tax years 2019-2020) as well as the bank

account that the defendant opened for the HM Four EIDL application in 2020, showed that HM Four was a passive owner of Alafaya Trails.

**Paragraphs 75 & 118:**

The government objects to the total offense level of 25, which does not include a two-level enhancement under U.S.S.G. § 2B1.1(b)(12) because the offense involved conduct described in 18 U.S.C. § 1040. As discussed below, both the PPP and the EIDL fraud perpetrated by the defendant constitutes "conduct described in 18 U.S.C. § 1040." U.S.S.G. § 2B1.1(b)(12).

*Background*

The Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act"), 42 U.S.C. §§ 5121-5208, governs federal assistance to state and local governments in the event of an "emergency" or "major disaster." *See id.* § 5122(1), (2) (defining "[e]mergency" and "[m]ajor disaster"). The President generally declares an emergency or major disaster at the request of "the Government of the affected State." *Id.* §§ 5170(a), 5191(a). The Act authorizes a wide array of federal aid, including coordination services, "technical and advisory assistance," and help with distributing "medicine, food, and other consumable supplies." *Id.* § 5170(a)(2)-(4).

Following the onset of the COVID-19 pandemic and the subsequent recession, the President declared an emergency under the Stafford Act on March 13, 2020. *See* Elizabeth M. Webster et al., Cong. Rsch. Serv., *Stafford Act Declarations for COVID-19 FAQ* 1 (Apr. 22, 2020), https://crsreports.congress.gov/product/pdf/R/R46326; 42 U.S.C. § 5191(b). In the weeks that followed, he further authorized "major disaster" declarations for all 50 States under the Stafford Act. *See* Webster, *supra*, at 1; 42 U.S.C. § 5170(a). The Small Business Administrator issued disaster declarations for each State as well. *See* Notice, Administrative Declarations of Economic

Injury Disasters for the Entire United States and U.S. Territories, 85 Fed. Reg. 19,052 (Apr. 3, 2020). These declarations enabled the Small Business Administration ("SBA") to exercise its authority to make or guarantee loans to small businesses that suffered a "substantial economic injury" caused by a disaster where the business was located. 15 U.S.C. § 636(b)(2)(A), (C). These loans were called "economic injury disaster loans" ("EIDLs"). *See* 13 C.F.R. §§ 123.300-123.304.

On March 25, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which established the Paycheck Protection Program that provided potentially forgivable loans to small businesses for use meeting payroll and, to a lesser extent, other operating costs. *See* CARES Act § 1102, 134 Stat. 281, 286-94. The CARES Act also increased funding for EIDLs, and enabled EIDL applicants to forgo certain eligibility requirements and to receive advance payments up to $10,000. CARES Act §§ 1107(a)(6), 1110, 134 Stat. at 302, 306-07. Congress authorized multiple rounds of funding under the CARES Act (in March, April, and December of 2020).

### *Argument*

The two-level enhancement pursuant to USSG §2B1.1(b)(12) applies "[i]f the offense involved conduct described in 18 U.S.C. 1040," which in turn prohibits fraud "involving any benefit authorized, transported, transmitted, disbursed, or paid in connection with a major disaster declaration . . . or an emergency declaration under" the Stafford Act. USSG §2B1.1(b)(12); 18 U.S.C. § 1040(a). A "benefit" includes any "payment" or "money," 18 U.S.C. § 1040(c), and there is no dispute that the COVID-19 pandemic was declared as both a major disaster and an emergency under the Stafford Act, as set forth above. As explained below, section 1040(a)'s text,

structure, context, and history establish that the PPP and EIDL funds the defendant sought to obtain by fraud in this case were "authorized, transported, transmitted, transferred, disbursed, or paid in connection with" the Stafford Act declarations.  18 U.S.C. § 1040(a).[1]

### A. Text and Structure

Section 1040(a)'s language, referring to benefits "paid in connection with a major disaster declaration . . . or an emergency declaration" is logically read to apply broadly to benefits paid in connection with a disaster or emergency that is the subject of a Stafford Act declaration.  The declaration triggers the statute's applicability.  "If Congress intended a narrower interpretation, it could have easily used narrower language," *Mont v. United States*, 587 U.S. ___, 139 S. Ct. 1826, 1832-33 (2019), such as by writing subsection (a) to reach only benefits paid "as a result of" or "pursuant to" a Stafford Act declaration.  *Cf.* 42 U.S.C. § 5160(a) ("Any person who intentionally causes a condition for which Federal assistance is provided under this chapter or under any other

---

[1] [1]The government has found no case in which the application of U.S.S.G. §2B1.1(b)(12) was directly addressed.  In two Fourth Circuit decisions involving appeals by co-defendants, *United States v. Griffin*, 2024 WL 1505512 (4th Cir. Apr. 8, 2024), and *United States v. Redfern*, 2023 WL 2823064 (4th Cir. Apr. 7, 2023), the defendants appealed the district court's decision to impose the Section 2B1.1(b)(12) enhancement to the EIDL benefits (and not the PPP benefits) in connection with the defendants' sentencing on COVID-related loan fraud.  The Fourth Circuit stated that it did not need to decide the issue, and upheld the imposition of the enhancement under a harmless error standard (The Court stated, "'we also have no need to pass on it here' …. Assuming *arguendo* that the district court erred in applying § 2B1.1(b)(12), that error is clearly harmless because even if the court had decided the issue the other way, it would have imposed the same sentence, and that sentence would have remained reasonable.").  Similarly, in *Jones v. United States*, 2023 WL 6541023 (M.D. Fla. Oct. 6, 2023), the district court imposed the Section 2B1.1(b)(12) enhancement to the defendant's wire fraud conviction relating to COVID-19 loans, but the Eleventh Circuit issued a *per curiam* decision affirming the conviction and granting defense counsel's motion to withdraw, after finding there were "no arguable issues of merit" to warrant a direct appeal (11th Cir. Case No. 22-12484, March 29, 2023).  Nor was the enhancement an issue addressed in the collateral challenge under 28 U.S.C. § 2255. *See id.*, 2023 WL 6541023, at *2.

Federal law *as a result of a declaration* of a major disaster or emergency under this chapter shall be liable to the United States . . . ." (emphasis added)).

The text of section 1040(a) suggests that Congress meant for subsection (a) to have an expansive scope, not a narrow one. It used the phrase "in connection with" which typically bears a "broad interpretation." *Mont*, 139 S. Ct. at 1832 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)). Congress preceded "in connection with" in section 1040(a) with a litany of verbs ("authorized, transported, transmitted, transferred, disbursed, or paid"), which further connotes breadth. *See United States v. Shrader*, 675 F.3d 300, 311 (4th Cir. 2012) ("Congress often uses multiple words with overlapping meaning to capture a broad swath of conduct." (quoting *United States v. Lawreys*, 653 F.3d 27, 41 (D.C. Cir. 2011) (Brown, J., dissenting in part))).

Moreover, section 1040 must be read as a whole, and a narrow reading of subsection (a) "when viewed in isolation is untenable in light of [the statute] as a whole." *Dep't of Revenue v. ACF Indus. Inc.,* 510 U.S. 332, 343 (1994) (citation omitted). The rest of section 1040 makes even clearer that the statute applies to benefits that do not have a direct relationship to a Stafford Act declaration. Subsection (c) defines "benefit" to include not just federal benefits but also any benefit provided by "a State or local government, or other entity." Stafford Act declarations are made by the President of the United States, 42 U.S.C. §§ 5170(a), 5191(a), so any relationship between a Stafford Act declaration and benefits provided by a different sovereign—or an entity that is not governmental at all—would generally be indirect by definition. Indeed, the government is aware of no benefits provided by private entities that directly relate to Stafford Act declarations. And there appear to be few benefits provided by state or local governments that

depend on a Stafford Act declaration. Most references to the Stafford Act in state law refer to the acceptance and distribution of federal aid. *See, e.g.,* Idaho Code Ann. § 46-1025.[2] Because only federal benefits are likely to have a direct nexus with a Stafford Act declaration, reading section 1040 to require that kind of nexus would risk rendering superfluous much of subsection (c)—and the entire statute, since subsection (c) is a definitional provision—or at least leave much of it "with little, if any, meaningful application." *Nijhawan v. Holder*, 557 U.S. 29, 39 (2009). "The canon against surplusage is not an absolute rule," but it "is strongest when," as here, "an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385-86 (2013) (cited with approval in *Yates v. United States*, 574 U.S. 528, 543 (2015).

Section 1040's jurisdictional provision reinforces the point. Subsection (b) provides that the statute extends to benefits that (1) are provided "in or affect[ing] interstate or foreign commerce," (2) are provided through the mail, or (3) come from the federal government. These jurisdictional hooks, especially the first, strongly suggest that Congress intended for section 1040 to reach all benefits provided in connection with a Stafford Act emergency or major disaster, not just benefits paid specifically pursuant to or as a result of a Stafford Act declaration, which would nearly always come from the federal government. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) ("The phrase 'affecting commerce" indicates Congress' intent to regulate to

---

[2] *See also* 42 U.S.C. § 5122(2) (defining "[m]ajor disaster" under the Act as an event that warrants federal assistance "to supplement the efforts and available resources of States, local governments, and disaster relief organizations"). Such benefits are still "provided by the United States," under 18 U.S.C. § 1040(c), just through intermediaries. *See, e.g., City of Pembroke Pines v. FEMA*, 510 F. Supp. 3d 1126, 1131 (S.D. Fla. 2021). Section 1040 looks nothing like federal statutes that specifically target schemes to defraud recipients of federal funds. *E.g.,* 18 U.S.C. § 666.

the outer limits of its authority under the Commerce Clause."). Read as a whole, section 1040 makes sense if it reaches benefits provided in connection with an incident triggering a Stafford Act declaration, not just benefits linked with the declaration itself.

### B. Context and History

Section 1040's background confirms the plain meaning of its text. Congress enacted section 1040 in the Emergency and Disaster Assistance Fraud Penalty Enhancement Act of 2007 (the "Disaster Fraud Act"), Pub. L. No. 110-179, § 2(a), 121 Stat. 2556, 2556-57 (2008). *See also id.* § 5, 121 Stat. at 2557-58 (directing the Sentencing Commission to promulgate the section 1040 sentencing enhancement). Both the Senate and House committee reports—which represent the most useful form of legislative history, *see Garcia v. United States*, 469 U.S. 70, 76 (1986)—state that section 1040 was intended to "prohibit[] fraud in connection with any emergency or disaster benefit," "including federal assistance *or private charitable contributions*," the latter of which would seldom or never directly relate to a Stafford Act declaration. S. Rep. No. 110-69, at 4 (2007) (emphasis added); *accord* H.R. Rep. No. 109-473, at 18 (2006). The legislation was spurred by the extensive fraud that followed Hurricanes Katrina and Rita, and the committee reports highlighted instances of fraud involving benefits with no direct connection to Stafford Act declarations. *See* S. Rep. No. 110-69, at 2-3 (noting creation of "phony Katrina-related websites to exploit those who wished to contribute to legitimate disaster assistance efforts" and a volunteer who stole Red Cross funds intended for Katrina victims); H.R. Rep. No. 109-473, at 2 (same). Indeed, the Senate Report explained that the Disaster Fraud Act was enacted in response to general "concerns that the current provisions of title 18, United States Code, do not adequately address or deter fraud in connection with emergency and disaster assistance." S. Rep. No. 110-69.

In addition, the same Disaster Fraud Act amended the federal wire- and mail-fraud statutes, 18 U.S.C. §§ 1341 and 1343, to provide for enhanced penalties "[i]f the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in [the Stafford Act])." Pub. L. No. 110-179, §§ 3, 4, 121 Stat. at 2557. These provisions clearly require a connection only to the incident prompting a Stafford Act declaration, not the declaration itself. Congress intended for these portions of sections 1040(a), 1341, and 1343 to mean the same thing. *See* S. Rep. No. 110-69, at 6-7 (explaining that the amendments of sections 1341 and 1343 "increase[] the penalties available" for wire and mail fraud "that occur[s] in connection with major disaster or emergency *declarations*" (emphasis added); H.R. rep. No. 109-473, at 5 (same).

Furthermore, in the same Disaster Fraud Act, Congress required the U.S. Sentencing Commission to forthwith promulgate sentencing guidelines to provide increased penalties for persons convicted of fraud in connection with a major disaster declaration or an emergency declaration. *See* Section 5(a) of the Disaster Fraud Act; *see also*, September 2008 U.S. Sentencing Commission Report to Congress in response to the Disaster Fraud Act. The Sentencing Commission worded the final version of the enhancement in USSG §2B1.1(b)(12) broadly. As explained by the Commission, "the broader directive in section 5(b) of the Disaster Fraud Act covers all 'fraud or theft offenses in connection with a major disaster declaration'" which is why the Commission worded the enhancement to apply to all conduct "described in 18 U.S.C. § 1040." *See* September 2008 U.S. Sentencing Commission Report to Congress, at 12. This is consistent with Disaster Fraud Act's Senate Report, which explains that the changes

brought by the Act were designed to "send a strong message that disaster relief crime is a serious crime." S. Rep. No. 110–69.

### C. PPP and EIDL Payments Are Benefits Covered by 18 U.S.C. § 1040

It follows from the foregoing that the section 1040 sentencing enhancement in USSG §2B1.1(b)(12) applies in this case. Section 1040 prohibits fraud involving benefits provided in connection with a major disaster or emergency that is the subject of a Stafford Act declaration—here, the COVID-19 pandemic. The defendant's fraud scheme involved PPP loans and EIDLs, benefits that were clearly provided in connection with the COVID-19 emergency.

Moreover, in section 1110(f) of the CARES Act, Congress amended the Small Business Act specifically to authorize EIDLs in the event of "an emergency involving Federal primary responsibility determined to exist by the President under the [sic] section 501(b) of the [Stafford Act]." 15 U.S.C. § 636(b)(2)(D). The President had declared such an emergency with respect to COVID-19 on March 13, 2020. *See* Webster, *supra*, at 2.

EIDLs were also authorized under the President's major-disaster declarations under the Stafford Act, one of which was issued for Florida on March 23, 2020; and under the Small Business Administrator's disaster declarations, one of which was issued for Florida on March 18, 2020. *See* 15 U.S.C. § 636(b)(2)(A), (C); Notice, Florida; Major Disaster and Related Determinations, 85 Fed. Reg. 20,700 (Apr. 14, 2020); Notice, Administrative Declarations of Economic Injury Disasters for the Entire United States and U.S. Territories, 85 Fed. Reg. 19,052 (Apr. 3, 2020). Thus, COVID-19 EIDLs were unquestionably a benefit "paid in connection with a major disaster declaration . . . or an emergency declaration under" the Stafford Act. USSG §2B1.1(b)(12); 18 U.S.C. § 1040(a).

As explained above, the Section 2B1.1(b)(12) enhancement applies to the defendant's fraudulent scheme to obtain PPP and EIDL loans. The COVID-19 pandemic was the subject of disaster declarations. This is exactly the type of disaster fraud case for which Congress directed the U.S. Sentencing Commission to create an enhanced penalty. Disaster fraud is a serious crime and the penalty should reflect that.

                Respectfully submitted,

                MARKENZY LAPOINTE
                UNITED STATES ATTORNEY

By:   *s/Aimee Jimenez*
      Aimee C. Jimenez
      Assistant United States Attorney
      Court No. A5500795
      99 Northeast 4th Street
      Miami, Florida 33132-2111
      Tel: (305) 961-9028
      Email: aimee.jimenez@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 9, 2024, I electronically filed the foregoing Objections to the PSR with the Clerk of the Court using CM/ECF.

                *s/Aimee Jimenez*
                Aimee C. Jimenez
                Assistant United States Attorney